# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| WALTER D. CLAPP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:23-cv-00133-ABJ |
| | ) | |
| UNITED STATES OF AMERICA, UNITED | ) | |
| STATES DEPARTMENT OF THE INTERIOR, | ) | |
| NATIONAL PARK SERVICE, and | ) | |
| YELLOWSTONE NATIONAL PARK | ) | |
| SUPERINTENDENT CAMERON SHOLLY, in his | ) | |
| official capacity, | ) | |
| | ) | |
| Defendants. | ) | |

---

## DECLARATION OF KENNETH (KEN) WATSON

---

I, Ken Watson, declare as follows:

1. I am the Revenue and Fee Business Manager, at Yellowstone National Park (Yellowstone or Park), a system unit within the National Park Service, an agency of the U.S. Department of the Interior (Department), mainly located in Wyoming, with portions in Montana and Idaho. In my capacity as the Revenue and Fee Business Manager, I am responsible for managing the Special Park Uses program, the Recreational Fee program, backcountry offices, and the Visitor Services Office at Yellowstone National Park. My first line supervisor is Chris Flesch, Chief Ranger for the Park.

2. On Thursday, July 6, 2023, at 10:06, Mr. Clapp left a message on Rachel Cudmore's office voicemail. Rachel Cudmore is the Park's Special Use Permit (SUP) Coordinator, and she reports to me.

1

3. Later that same day, at 16:28, Mr. Clapp and Rachel spoke on the phone. After the call, Rachel contacted me and Chief Ranger Chris Flesch to discuss Mr. Clapp's request. Rachel shared with us that Mr. Clapp, who is running to be the next president of the United States, wanted to bring his dog and draft horses and wagon through the Park and utilize various First Amendment sites. Rachel also informed us that she asked Mr. Clapp to send a detailed request to the Park's Special Use Permit email inbox (SUP inbox). Since Mr. Clapp's planned arrival date was July 16, 2023, we wanted to make sure we started discussing this request right away. Mr. Clapp's email outlining his General Plan arrived that evening at 20:58 to the SUP inbox. Rachel and I both have access to the Park's SUP inbox, and we can both send, receive, and view emails on behalf of the Park's SUP program.

4. On Friday, July 7, 2023, at 8:42, after Rachel, Chris, and I reviewed and discussed Mr. Clapp's General Plan outlined in his email, Rachel, using the Park's SUP email inbox, responded to Mr. Clapp by email and requested that he complete a Special Use Permit application. Mr. Clapp emailed an application to the SUP inbox at 10:34.

5. Mr. Clapp's application for a SUP for activities within Yellowstone National Park requested 1) driving a horse-drawn wagon across the Park with multiple stops for First Amendment activities, including speaking to visitors from the tailgate of his wagon; 2) camping in the frontcountry with his horses; and 3) walking his horses through the backcountry for portions of the trip.

6. In Yellowstone National Park the "frontcountry" is considered the developed areas within the Park. Per 36 C.F.R., the NPS defines "developed area" as roads, parking areas, picnic areas, campgrounds, or other structures, facilities or lands located within development and historic

zones depicted on the park area land management and use map. All other areas are considered "backcountry."

7. All First Amendment locations within the Park are in developed, frontcountry areas.

8. On the morning of Monday, July 10, 2023, at 8:56, I informed Maggie Tyler, National Park Service Program Manager for Special Park Uses that this SUP request was pending. I worked closely with Maggie Tyler to respond to the request.

9. On July 11, 2023, Rachel sent an email at 16:58 to Mr. Clapp from the SUP email inbox requesting additional details about his wagon, including the dimensions, a photo, information on use and how the wagon would be secured, to which he responded that same day via email at 17:33.

10. On Friday, July 14, 2023, I finalized but did not send the response letter from the Park to Mr. Clapp until after speaking with Mr. Clapp later that day. The letter explained that the National Park Service's Horses and Pack Animals regulation, found at 36 C.F.R. § 2.16, prohibits the use of horses and pack animals outside of trails, routes or areas designated for their use within the Park. This NPS regulation also prohibits the use of horses and pack animals on park roads, with limited exceptions. Mr. Clapp's requested use of stock did not fall within any of the exceptions.

11. The July 14, 2023 letter listed additional specific areas that horses are not allowed within the Park, as the Superintendent's Compendium specifically prohibits use of horses in those areas as well. The Superintendent's Compendium for Yellowstone National Park, dated April 4, 2022, is the summary of Park specific rules implemented under 36 C.F.R., Chapter 1, and it contains further restrictions, as permitted by 36 C.F.R. § 2.16, on the use of horses and pack animals within the Park.

12. Yellowstone National Park has approximately 4 million visitors each year, with the majority coming between May and September. The Park averages one million visitors during the month of July. The Park has a strong interest in protecting both the visitors and the resources within the Park. In addition to being prohibited under Federal regulation, the use of horses on paved roadways would add to potential traffic gridlock during this heavily visited timeframe and create a safety issue for Mr. Clapp and his horses, visitors, rescue vehicles, and park resources.

13. The July 14, 2023 letter explained that Mr. Clapp's horses were welcome within the Park, but they needed to remain trailered in the frontcountry. The letter also provided information to Mr. Clapp on private trail riding and camping options with his horses. Finally, the letter explained that Mr. Clapp could use the First Amendment locations within the Park without further permits, excluding his horses, unless he intended to use amplification, solicit donations, or use structures. If he intended to engage in these activities, he would need to continue to work with the Park to secure a permit. The wagon Mr. Clapp proposed to use is a structure.

14. On the morning of Friday, July 14, 2023, Tim Townsend, Deputy Chief Ranger, and I attempted to call Mr. Clapp to discuss his pending request, but he did not answer. Tim Townsend left a voice message for Mr. Clapp on his cell phone and requested that he call back. At 12:07, Mr. Clapp called back. We had a phone conversation with Maggie Tyler, Tim Townsend, Walter Clapp, and myself. Tim Townsend went over the content of the letter we planned to send in response to Mr. Clapp's SUP application. In addition to the letter's content, some First Amendment designated sites were discussed in detail. Mr. Clapp requested we reconsider the use of horses and requested a frontcountry camping location for his horses (and him). He also asked about backcountry campsites; expressed concerns about the horses; and requested he be allowed to camp in "closed areas."

4

15. On July 14, 2023, at 15:02, I emailed the July 14, 2023, response letter to Mr. Clapp. The Park further considered Mr. Clapp's additional questions, and I wanted to again discuss these issues with Mr. Clapp. Tim Townsend and I spoke with Mr. Clapp on the phone and confirmed the Park's decision remained as previously discussed, again explaining that his horses were not allowed on Park roads. Mr. Clapp stated he planned to come to the Park on Monday, July 17, 2023. Tim Townsend and I provided Mr. Clapp information on possible campground options outside of Yellowstone that accepted or may accept stock, including the U.S. Forest Service (USFS) Eagle Creek Campground just outside the town of Gardiner, Montana at the Park's North Entrance.

16. On Monday, July 17, 2023, at 8:21, the Park's SUP inbox received an email reply from Mr. Clapp. His email included more specifics on the dates, times, and locations that he planned to use the designated First Amendment sites, starting on July 17, 2023. He informed the Park that he had obtained a few nights of backcountry permits within Yellowstone where he would be camping with his horses.

17. Mr. Clapp and I had tentative plans to talk Monday morning, but I did not hear from him. I tried calling him late in the day knowing he wanted to conduct his activities soon. We finally connected via phone at 17:30. Unfortunately, the cell phone calls kept dropping. Understanding Mr. Clapp was just a few miles away in the USFS Eagle Creek Campground, I decided to meet with Mr. Clapp in person and drove up to the campground at 17:45, arriving just before 18:00, with a hard copy of the permit and the July 14, 2023, letter that had been discussed and emailed to Mr. Clapp the previous Friday. I explained I had two versions of the permit, one with blanks for times so Mr. Clapp's preferred times could be entered and another with estimated times based on the logistics he had provided to the Park. The permit allowed for use of his wagon

and his dog in the designated First Amendment sites (we consider the wagon a structure for this use). Mr. Clapp was advised he could solicit donations and sell or distribute printed matter with the permit. Mr. Clapp and I discussed his day; plans for his time in Yellowstone; the permit; possible alternatives, including parking lots and amphitheaters; clarification on trailering of his horses; safety; and key points he wanted clarified. During this in person meeting, Mr. Clapp explained the reason he was unavailable earlier in the day was because his horses had escaped the USFS furnished corral at his campsite, and he had spent half the day trying to catch his two horses. Mr. Clapp then shared that he had plans to meet a group and give wagon rides in Gardiner, Montana while he contemplated what to do and allow time for clarification on some of his pending questions. I gave Mr. Clapp the permits to review and sign if he wished. Special Use Permits are not valid until signed by both the requester and the designated official at the Park. I departed the campground just after 19:00.

18. Tuesday, July 18, 2023, I discussed Mr. Clapp's concerns with Tim Townsend, and we concluded that the Park's initial decisions stood. Chief Ranger Chris Flesch joined the discussion later, and we agreed the horses needed to remain in the trailer based on the NPS regulation and the Superintendent's Compendium. We also confirmed that parking lots would not be used as First Amendment sites due to safety concerns and traffic flow, but Park amphitheaters may be permitted, with the same restriction that the horses must be trailered.

19. I drafted a second response letter to Mr. Clapp, dated July 18, 2023, which reiterated previous points and provided additional clarification. I tried to call Mr. Clapp twice (11:46 and 13:23), but I was not able to reach him. Another call was made at 14:48 and dropped. At 15:05, I was able to reach Mr. Clapp and informed him of the Park's decisions to his questions and requests. We discussed the information contained in the letter.

6

20. On Wednesday, July 19, 2023, at 10:17, I emailed the July 18, 2023, response letter and a revised Special Use Permit to Mr. Clapp.

21. Mr. Clapp had previously shared that he had a wagon ride planned with a group on July 19, 2023, and thought he would be in the Park sometime after he completed the event and packed up camp. Mr. Clapp arrived in the Park late afternoon through the North Entrance and proceeded to the Mammoth Backcountry Office to pick-up his overnight backcountry permits. Park Rangers issued him the backcountry permit(s).

22. I heard Mr. Clapp was in the Park and went to meet him at approximately 16:45 at the Mammoth Backcountry Office. Over the course of the day, I had made some changes to the permit. I gave Mr. Clapp a copy of the revised permit that removed a few conditions and expanded the times and dates per Mr. Clapp's request. Mr. Clapp stated he had a personal issue he needed to take care of and was planning on camping in the Park and then heading out. Mr. Clapp stated he knew a lot of work had gone into the permit and apologized for not being able to use it. At no time did Mr. Clapp accept and sign any of the Special Use Permits offered to him.

23. There has been no other contact between Mr. Clapp and the Yellowstone Special Use Permit Office since July 19, 2023.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2023.

KENNETH
WATSON

Digitally signed by KENNETH WATSON
Date: 2023.08.11 14:28:48 -06'00'

Ken Watson, Revenue and Fee Business Manager
Yellowstone National Park